(30 App. Div. 589.)

### HARDT et al. v. DEUTSCH et al.

(Supreme Court, Appellate Division, First Department. June 10, 1898.)

FRAUDULENT CONVEYANCE.

     Where a creditor holds a chattel mortgage upon property of his debtor, which is voidable by other creditors on account of an illegal verbal agreement, but, before their rights have become fixed or they have taken any action to disaffirm it or obtain any lien, the illegal agreement is annulled, and the debtor voluntarily transfers possession of the property to the mortgagee as security for the indebtedness, this latter transfer is not invalidated by the originally voidable character of the mortgage.

Appeal from special term, New York county.

Action by Engelbert Hardt and others against Simon L. Deutsch and others. From a judgment dismissing the bill (48 N. Y. Supp. 564), plaintiffs appeal. Affirmed.

Argued before BARRETT, RUMSEY, McLAUGHLIN, and INGRA-
HAM, JJ.

A. Blumenstiel, for appellants.
Joseph Fettretch, for respondents.

INGRAHAM, J.　This is a creditors' bill brought to have fore-
closed two chattel mortgages made by the defendants Deutsch & Co.,
—one to the defendants composing the firm of Wallach & Schiele,
and the other to the defendant Nathan Silverstein.　Copies of the
mortgages are annexed to the complaint.　The mortgages are identi-
cal in form, and, after reciting an indebtedness of the mortgagors to
the mortgagees, for the purpose of securing the payment of such in-
debtedness the mortgagors "bargain and sell unto the said parties of
the second part all the goods, chattels, merchandise, manufactured,
unmanufactured, and in process of manufacture, stock in trade, furni-
ture, machinery, fixtures, tools, appliances, appurtenances of every
kind, and all merchandise and stock of every kind, nature, character,
and description, used by us in the conduct of our business, and being
all the property, effects, stock, merchandise, and fixtures now con-
tained in the premises occupied by us at 39 and 41 West Twenty-
Third street, and 20 West Twenty-Fourth street, in the city of New
York,"—with a general warranty as to title; the said sale being
made on condition that "if the said parties of the first part shall
and do well and truly pay unto the said parties of the second part,
their executors, administrators, and assigns, the aforesaid sum of
forty-two thousand five hundred and fourteen $^{06}/_{100}$ dollars, with
interest upon demand, the said sum being the amount of our indebt-
edness to the parties of the second part, as hereinbefore set forth,
then these presents shall be void."　The mortgages further provide
that, in case default shall be made in the payment of the sum above
mentioned, the parties of the second part are authorized and em-
powered to enter said premises, and take and carry away the goods
and chattels, and to sell and dispose of the same for cash, or for the
best price they can obtain; and out of the moneys arising therefrom
to retain and pay the said sum above mentioned, and all reasonable
charges and expenses touching the same, rendering the surplus, if
any, unto the said parties of the first part, or to their executors, ad-
ministrators, or assigns.　These mortgages were at once filed, as re-
quired by the statute.

These mortgages upon their face are valid.　They contain no pro-
vision authorizing the mortgagors to sell the mortgaged property and
use the proceeds in their business.　The court found as a fact that at
the time of the execution and delivery of the mortgages there was an
understanding between the mortgagees, on the one side, and Deutsch
& Co., the mortgagors, on the other, that the said mortgagors were to
remain in possession of the mortgaged property, and to sell and dis-
pose of the same in the ordinary course of trade, and out of the pro-
ceeds of such sale to pay the expenses of conducting such business,
such as rents, salaries, etc.; but that such understanding was never
carried out, and was abrogated and annulled before any knowledge

of the existence of the mortgages could have transpired, and before any of the property could have been disposed of, and that, while in fact the transactions were still continuing, the possession and control of the property was handed over by Deutsch & Co. to the mortgagees.

It may be assumed that such an agreement as is here found by the court, whether contained in the instrument or independent of it, avoided the mortgage as to creditors, and that, if it were void as to part of the chattels covered by it, it was void as to the whole. Hangen v. Hachemeister, 114 N. Y. 570, 21 N. E. 1046, and cases there cited. It is, however, clear that where a mortgage is valid upon its face, and an agreement which invalidates it consists of a mere verbal understanding between the parties from which an intent to hinder and delay creditors can be inferred, and where before the agreement is carried into effect, or anything is done under it, and before any creditor has elected to have it declared void or has acquired any lien upon the mortgaged property, the parties to the agreement, either expressly or by a tacit agreement between themselves, may abrogate the agreement or understanding which would make the mortgage voidable, and agree that the mortgage shall be valid and enforceable as though such illegal agreement had never been made, under such circumstances, other creditors of the mortgagors cannot take possession of the mortgaged property from the mortgagees except upon payment of the mortgaged debt. At the time of the execution of this mortgage the debtor had the right to borrow money and to execute the mortgages as security, and these mortgagees did advance to the mortgagors a considerable sum of money, which this mortgage was given to secure. It was not fraudulent for these mortgagees to take mortgages from their debtors to secure the advances then made or the indebtedness that then existed. The object for making the loan undoubtedly was to enable the mortgagees to continue business, and, to accomplish that result, it was necessary that the mortgagees should sell their merchandise, and undoubtedly that was the intention of the parties at the time the mortgages were made. There was, however, no concealment of the existence of these mortgages. They were at once filed. The mortgagees advanced to the mortgagors $30,000. It was used by the mortgagors in the payment of their debts. There was no actual intent to defraud anybody; and it is quite clear that neither the creditors nor the mortgagees were acquainted with the rule of law which makes a mortgage void as to creditors when there is an agreement that the mortgagors should be allowed to sell the mortgaged property for their own benefit. It is not clear, moreover, that the agreement, as testified to by the witnesses for the plaintiffs, was such an agreement as makes the mortgages void as to creditors. Assuming, however, that the agreement as proved, and as found by the court, was sufficient to avoid the mortgages, we think that there was such an abrogation of that agreement as to justify the finding of the court that such an understanding was never carried out, and was abrogated and annulled before anything was done under it. These mortgages in question were executed early in the morning of the 16th of May, 1896, when the advances were made to the mortgagors by the mortgagees. Immediately after they were executed they were filed in

the office of the register, and it was shown that the mortgages were filed on the 16th of May, at 11:26 and 11:28 a. m.    After the mortgages were executed, the mortgagee who had acted on his own behalf and for his co-mortgagee went back to his office, and discussed what he had done with his partner.    After that discussion he returned to his attorneys, and questioned them again as to the security, asking his attorneys whether he had any control over the property while it was in the mortgagors' possession, and whether, in case the mortgagors disposed of the property, his security would be diminished in consequence, to which his attorneys answered that the witness' security was in the fact that he could demand his money at any moment. He at once demanded the repayment of the money, and the mortgagors were sent for.    A demand was made upon the mortgagors for the money or the possession of the property which was acquired in the mortgagors, who delivered possession of the property to the mortgagees between 1 and 2 o'clock on the same day.    The mortgagors went out of possession, and subsequently had nothing more to do with the property or its proceeds, the mortgagees discharging all of the employés, except such as were necessary for selling and disposing of the merchandise, and putting their own representatives in possession of the property.    What happened when this demand was made is as follows:    At about 11 o'clock in the morning the mortgagee went to the mortgagor.    The mortgagee said to the mortgagor, "I want my money."  He said, "I have not got it."    "I told him I would take possession of the store."  The mortgagor and the mortgagee together then went to the store of the mortgagors, arriving there some time between 1 and 2 o'clock.    The mortgagor introduced the mortgagee to the bookkeeper, and told him (the bookkeeper) that he had charge of the place.    "Then I took charge of the place, and sent for a cousin of mine, who was then out of business, and I put him in charge."

Thus, immediately after the mortgages were executed, before anything was done by any of the parties to the agreement, except to advance the money and execute the mortgages to secure its repayment, the mortgagees expressly repudiated any understanding or idea that the mortgagors were to remain in possession of the property or use it in any way; and, without objection of the mortgagors,—in fact, with the consent and assistance of the mortgagors,—the mortgagees were put in possession of the property, and proceeded to hold it as security for the indebtedness.    Although the mortgagors and mortgagees were subsequently at enmity in consequence of the action of the mortgagees, there was not the slightest evidence that, when these mortgagees took possession of the property, any claim was made that that possession was in violation of any agreement that existed.    Nor was there the slightest opposition by the mortgagors to the act of the mortgagees in taking possession.    It was certainly an agreement between the parties by which any tacit understanding as to the defendants remaining in possession was abrogated, and possession given of the mortgaged property to secure the payment of their indebtedness.    There was no actual foreclosure of the mortgage.    The property was not taken by force or against the will of the mortgagors.

But upon the mortgagees insisting upon their right to immediate possession of the property, notwithstanding the provisions of the mortgage or any understanding that there was between them, that right was acquiesced in by the owner of the property, and they voluntarily delivered possession of it to the mortgagees as security for the payment of their debt.

Even assuming that this agreement as found by the court was made, the mortgage was voidable only at the election of the creditors of the mortgagors, not void. The mortgagors had actually loaned the mortgagees the sum of $30,000 upon the security of these goods included in this mortgage; and, immediately after making that loan, they, with the assent of the debtor, took possession of the property which, under their agreement, was to be security for the existing indebtedness and advances made, and continued in actual and undisturbed possession thereof. If there had been no mortgages outstanding, and the creditors had demanded of the debtor a delivery of the property as security for the indebtedness, and the debtor had proceeded to deliver the property to the creditors, as he did in this case, there can be no question but that this creditor's right to the possession of the property as against the other creditors would have been perfect, and that the creditors proceeding under such a delivery to dispose of the property, and repay themselves the amount due, delivering the balance of the property not needed to pay their indebtedness to the debtors, or debtors' assigns, would have been a valid proceeding, for which the creditors could not have been held responsible. The mere existence of the chattel mortgage, which we will assume was voidable as against creditors, could not make this voluntary act of the debtor in delivering the property to the creditor invalid; nor would the other creditors have the right to impeach that transfer, because, if the mortgagees had proceeded under their mortgage to take possession of the property and hold it, the creditors of the mortgagors could have attacked the mortgage and possession under it. The mortgagees acquired their right to hold this property, not under the mortgage, but under the voluntary act of the defendants in delivering it to them as security for the indebtedness which was conceded to be due. The mortgage was evidence of the indebtedness, and that indebtedness was payable on demand. The creditors demanded the payment of the indebtedness, and demanded possession of the property of the debtor as security for that indebtedness; and to that demand the debtor acceded, and delivered possession of the property to the creditors. It may be conceded that, but for this voluntary act of the debtor in transferring his property to the creditor as security for the indebtedness, the right of the mortgagees to hold the property under the mortgage would have been subject to attack by the other creditors of the mortgagors. But where a creditor holds a chattel mortgage upon property of his debtor which is void as against other creditors, and before the rights of such other creditors have become fixed, or any action has been taken by them to disaffirm the mortgage or obtain any lien upon their debtors' property, the debtor voluntarily transfers the possession of his property to the creditor as security for the indebted-

ness, the mere fact that the creditor could not have enforced his mortgage does not invalidate the voluntary act of the mortgagor in making a new transfer or pledge of his property to his creditor which is valid. This has been expressly held in case after case decided by the courts of this state. The latest case on this subject is Bowdish v. Page, 153 N. Y. 108, 47 N. E. 45, where the court says:

"When he [plaintiff] became the general assignee of M. & L. Allison for the benefit of their creditors, on July 21, 1884, he found an existing indebtedness as to assignors from Isaac Allison. Isaac had executed an instrument in the nature of a chattel mortgage to secure his indebtedness, which, the referee found, though made in good faith, had become void through the conduct of the parties with respect to the property so mortgaged. A few days subsequent to the assignment, however, Isaac, upon the demand of the plaintiff, reinforced by threats of legal proceedings based upon his indebtedness to the assigned estate, personally and orally transferred to the latter the goods in question which were covered by the mortgage. The referee has found that that transfer was followed by an actual possession, taken by the plaintiff, and continued until the property was taken away by the sheriff, under a levy upon an execution issuing upon a judgment recovered by the defendant bank against Isaac Allison. The evidence is sufficient to support the findings of the referee, and to show that the plaintiff's title to the goods can rest upon the transaction between him and Isaac. It would, at least, show that there was a transfer to secure the payment of Isaac's debt, if not in satisfaction thereof, and that would vest sufficient title and possession in the plaintiff. At that time the bank had acquired no lien, no execution having issued upon its judgment theretofore entered until at a date subsequent to the plaintiff's acquisition of title. So far as the subsequent history of the matter shows, or tends to show, Isaac never regained possession of, nor was permitted the exercise of any acts of ownership over, the property. The plaintiff had, and retained, the exclusive possession, and Isaac's subsequent access to the building where the goods were stored—a fact upon which the appellant places much reliance—only concerned other property, except that he was allowed to make three sales of goods, the proceeds of which he remitted to the plaintiff. In that situation, plaintiff's right to the goods was superior to the bank's; for it rested, not upon the void chattel mortgage, but upon an independent transfer of possession by the mortgagor."

In this case the facts are almost precisely similar, except that there is no threat against the mortgagor or debtor by the creditor, but a voluntary transfer of the property, and the creditor never was allowed any control over the property transferred to the mortgagee. In the Bowdish v. Page Case, the mortgage of Isaac Allison to the plaintiff's assignor was void. Plaintiff's assignor insisted upon the transfer of the property. The mortgagor, in answer to that demand, delivered possession of the property to the mortgagee; and the court held that the title of the plaintiff to the goods could rest upon the transaction between him and Isaac,—that is, the demand for the possession of the goods and the delivery by Isaac of the goods to the plaintiff. The possession was thus held, not under the void mortgage, but under the delivery of the goods by the mortgagor to the mortgagee as security for the debt represented by the mortgage; and so, in this case, the right of the defendants to the possession of the property and its proceeds, which they have applied in the payment of their debts, rests, not upon the mortgage, but upon the delivery of the possession by the mortgagors to the mortgagees, either in payment or as security for the debt which was represented

by the mortgage. In the Bowdish v. Page Case, the court, after examining the decisions, said:

"We, therefore, hold that. within our decisions, the plaintiff occupied the vantage ground of a right to the possession of these goods, derived directly through Isaac's delivery to him, and any question of a title made defective through the void chattel mortgage was removed."

There is not a particle of evidence in this case to qualify the legal effect of the act of the mortgagors in delivering this property to the mortgagees, or to show that delivery was not legal, and vested a good title to the property in the defendants. The fact that the chattel mortgage was void as to creditors did not make the indebtedness of the mortgagors to the mortgagees void, or prevent the mortgagees from enforcing that indebtedness. Assuming that there was an agreement between the parties that the mortgaged property was to remain with the mortgagors, and they were to have a right to sell the mortgaged property and apply the proceeds to their own use, this act of the mortgagors in taking immediate possession of the property was an absolute abrogation of that agreement. The creditors demanded possession of the property of the debtors as security for their indebtedness. That demand was acquiesced in, and the debtors delivered to the creditors the possession of the property. These creditors, therefore, had the right to the possession of that property, derived directly through the debtors' delivery of it to them, and any question of title through the void chattel mortgage was removed. The act of the creditors was that of the owners or pledgees of property, selling it to repay themselves the amount of their indebtedness; and, long before these plaintiffs acquired any interest in or lien upon any of this property, these defendants had sold sufficient of the property to repay their indebtedness and transfer the balance to their debtors or their assigns; and those other creditors, whose equities are not at all superior to that of the respondents, seek to have the property of the respondents—the proceeds of their debtor's property which they have applied to the payment of their debt —taken from them to apply to the payment of the plaintiffs' debt, when the actual transfer of the property by the debtor to the creditor was valid, and gave to the creditor a right to hold the property as against the other creditors as well as against their debtor.

The plaintiffs, however, make the somewhat novel claim that because the mortgaged property was valued at $100,000 and upwards, and was given to secure an indebtedness of about $60,000, such a disparity between the amount of the security and the amount for which it was given to secure of itself is evidence of a fraudulent intent. The result of this would be that, the more ample the security given for a loan, the more certain would be the right to have the security declared void; but an estimate of value upon such goods is largely speculative, and, although it turned out that there was ample security for the loan due the respondents, the value of a stock of merchandise of this character is most uncertain and liable to constant fluctuation. It certainly cannot be said, because a person about to advance money required ample security for the advance, that that of itself is evidence that the instrument which gives such

security is void. Although it is true that the title to the goods mort-
gaged vests in the mortgagee upon the default in the payment of
the mortgage, the mortgagor still has an equity of redemption,
still is entitled to redeem from the mortgage, and is entitled to any
surplus upon a foreclosure, and his creditors can enforce such right.
All that the mortgagee can get is the money which is due to him
from the mortgagor, and while, after default in the payment of the
mortgage, the other creditors would have no leviable interest in the
property, they would have no difficulty in enforcing their right to any
surplus that remained in the hands of the mortgagee after the sat-
isfaction of his mortgage or lien upon the property.

We have come to the conclusion, therefore, that the plaintiffs
failed to establish their cause of action, and that the complaint was
properly dismissed. The judgment is affirmed, with costs. All
concur.